UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

AMANDA & REECE HEINRICH, et al.,       )
                                        )
                    Plaintiffs,         )        Case No. 5:06-cv-168
                                        )
v.                                      )        Honorable Joseph G. Scoville
                                        )
WAITING ANGELS ADOPTION                 )
SERVICES, INC., et al.,                 )        **OPINION**
                                        )
                    Defendants.         )
_____)

This is a civil action brought by seven couples against an adoption agency and its

principals.  Plaintiffs' third amended complaint alleges a claim under the Racketeer Influenced and

Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c), as well as a claim for RICO conspiracy,

18 U.S.C. § 1962(d).  In addition, plaintiffs bring common-law claims under the laws of the state of

Michigan.  Subject-matter jurisdiction is based solely upon the court's federal-question jurisdiction,

28 U.S.C. § 1331, as the parties are not completely of diverse citizenship.

Presently pending before the court is defendants' motion to dismiss the third amended

complaint, brought pursuant to Fed. R. Civ. P. 12(c) and 9(b).  For the reasons set forth below, the

court determines that plaintiffs have failed to state a claim upon which relief can be granted for a

substantive RICO violation or a RICO conspiracy.  Counts 7, 8 and 9 of the third amended complaint

will therefore be dismissed with prejudice.  In its discretion, the court determines that it should not

exercise supplemental jurisdiction over the state-law claims, which will be dismissed without prejudice.

## **Procedural History**

Plaintiffs initiated this action on October 24, 2006. Plaintiffs are couples who dealt with the Waiting Angels Adoption Services, Inc., a Michigan corporation, in their efforts to adopt Guatemalan children. Plaintiffs' original complaint named as defendants the Waiting Angels Adoption Services, Inc. and its two principals, Simone Boraggina and Joseph Beauvais. The case was stayed at plaintiffs' request for a period of almost one year, because of the pendency of state criminal proceedings against the individual defendants. After filing their original complaint, plaintiffs were granted leave to file two amended complaints in an effort to clarify their claims against defendants.

On March 4, 2009, the court conducted a hearing on defendants' motion to dismiss the second amended complaint. At the conclusion of the hearing, the court made oral findings, determining that plaintiffs had properly alleged only one proper RICO enterprise, namely, that Waiting Angels Adoption Services is an "enterprise" under 18 U.S.C. § 1961(4) and that defendants Boraggina and Beauvais are persons employed by the enterprise. The court found all other theories of enterprise set forth in the second amended complaint to be deficient. The court further determined that as a RICO enterprise, defendant Waiting Angels Adoption Services is not a proper defendant in a RICO action. The court went on to find that plaintiffs had failed to allege predicate acts of wire fraud and mail fraud with the specificity required by Rule 9(b) and that plaintiffs' allegations of extortion, solicitation of bribes, and violation of 18 U.S.C. § 2315 as predicate acts were insufficient.

The court therefore granted the motion to dismiss for failure to state a claim upon which relief can be granted, dismissing some claims with prejudice but granting plaintiffs leave to amend with regard to other claims, including its RICO claims.

Plaintiffs filed a third amended complaint on April 4, 2009. Counts 1 through 6 are state-law claims. Count 7 does not purport to state an independent civil cause of action, but sets forth allegations in support of the predicate RICO criminal offenses of mail fraud, 18 U.S.C. § 1344, and wire fraud, 18 U.S.C. § 1343. Count 8 alleges a RICO claim against defendants Simone Boraggina and Joseph Beauvais, asserting they conducted the affairs of an enterprise (Waiting Angels Adoption Services) through a pattern of racketeering activity, under 18 U.S.C. § 1962(c). Count 9 alleges a RICO conspiracy between Boraggina and Beauvais under 18 U.S.C. § 1962(d). Defendants filed an answer and a motion to dismiss under Fed. R. Civ. P. 12(c) and 9(b). The court conducted a hearing on August 21, 2009. For the reasons set forth below, the court concludes that plaintiffs have again failed to state a claim upon which relief can be granted under the federal RICO statute, despite their repeated efforts to allege a viable federal claim. The court will therefore dismiss all federal claims with prejudice, leaving the claims under Michigan common law to be adjudicated by the state courts.[1]

## **Applicable Standard**

Rule 12(b)(6) authorizes the dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Under Rule 8(a)(2) of the Federal Rules of Civil Procedure a complaint must provide "a short and plain statement of the claim showing that

---

[1] The parties have stipulated to the dispositive jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c).

the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957) and FED. R. CIV. P. 8(a)(2)).  While this notice pleading standard does require not require "detailed" factual allegations, it does require more than the bare assertion of legal conclusions.  *See Twombly*, 550 U.S. at 555.  "[C]ourts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555.  Rule 8 "demands more than an unadorned, the defendant-unlawfully-harmed me accusation." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 557).

Generally, when considering a Rule 12(b)(6) motion to dismiss, the court must construe the complaint in the light most favorable to plaintiff, accept the plaintiff's factual allegations as true, and draw all reasonable factual inferences in plaintiff's favor.  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949.  Claims survive a Rule 12(b)(6) motion only where the "factual allegations [are] enough to raise a right to relief above the speculative level on the assumption that all of the complaints allegations are true." *Twombly*, 550 U.S. at 555.

The Supreme Court's recent decision in *Iqbal* emphasized that a complaint must contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face:

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." [*Twombly*, 550 U.S.] at 570. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*, at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.*, at 557.

129 S. Ct. at 1949. "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not "show[n]" -- "that the pleader is entitled to relief." *Iqbal*, 129 S. Ct. at 1950 (quoting Fed. R. Civ. P. 8(a)(2)) (internal citations omitted); *see Hensley Mfg. v. Pro Pride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009).

In addition to satisfying these general pleading requirements, plaintiffs are held to the more rigorous standards of Rule 9(b) with regard to their claims based on fraud. Rule 9(b) requires that fraud be alleged "with particularity." Plaintiffs must therefore, at a minimum, allege the time, place and content of the allegedly false statements; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud. *See United States ex rel. Bledsoe v. Community Health Sys., Inc.*, 342 F.3d 634, 643 (6th Cir. 2003).

<u>**Allegations in Third Amended Complaint**</u>

Plaintiffs are seven couples who reside in various states, including the State of Michigan. (Third Am. Compl. ¶¶ 1-7).[2] Waiting Angels Adoption Services was a Michigan for-profit corporation located in Macomb, Michigan. Defendants Boraggina and Beauvais founded Waiting Angels and acted as officers and directors of the corporate defendant. (¶¶ 15-16). Waiting Angels conducted an international adoption business, dealing with clients on a nationwide basis. (¶¶ 17-21). The acts of defendants alleged in the complaint span the period from June 15, 2005, through November of 2006.

The predicate acts underlying plaintiffs' civil RICO claims consist of wire fraud, mail fraud, extortion, transportation of stolen goods or money in interstate commerce, and travel in aid of extortion. Because each plaintiff couple alleges different predicate acts, each couple will be discussed separately.

**1.      Plaintiffs Amanda and Reese Heinrich**

The Heinrich plaintiffs began their relationship with Waiting Angels Adoption Agency at some undisclosed time in 2005. They chose to adopt a baby named Selvin in June 2005 and signed a contract with Waiting Angels during the same month, wiring the company $12,000.00. They ultimately abandoned their adoption efforts in December 2006. The gravamen of their allegations of fraud arises from certain alleged misrepresentations by the individual defendants. The Heinrich plaintiffs allege that defendants (1) misrepresented the nonprofit status of Waiting Angels, (2) made false predictions of how long the adoption would take, (3) were evasive and frequently did

---

[2] All paragraph citations herein, unless otherwise specified, refer to plaintiffs' Third Amended Complaint (docket # 73).

not respond to inquiries, (4) suggested that Guatemalan officials may be looking for a bribe and encouraged plaintiffs to consider this, (5) represented that Selvin was available for adoption and that defendants could facilitate the adoption to completion. The Heinrich plaintiffs allege that they sent the $12,000.00 fee, in addition to other funds, to Waiting Angels in reliance on these alleged misrepresentations. (¶¶ 22-44).

      **2.**      **Plaintiffs David Kruger and Toni Flenniken**

The predicate acts alleged by these plaintiffs are wire fraud, mail fraud, and extortion. They allege that they entered into an adoption contract on October 25, 2005, and were told by Boraggina that the process would take about six months. Boraggina sent these plaintiffs an e-mail stating that she had sent the paperwork to the embassy on December 23, 2005, when in fact the files were not sent until January 3, 2006. These plaintiffs allege that they were also given false predictions concerning the length of time that the adoption would take. In frustration, they hired a different agency, Adoption Supervisors, to help facilitate their adoption case. The Flenniken plaintiffs traveled to Guatemala in March 2006 to visit the putative adoptee, a baby named Maria, and were taken to an orphanage where the baby was living. They then realized that they had been misled into paying money for foster care, as the baby had never lived in foster care but had been in an orphanage. Toni Flenniken decided to remain in Guatemala and to care for Maria herself until the adoption was complete. Defendant Boraggina, when she learned of the arrangement, objected to it and berated plaintiffs, demanding that they take the baby back to the orphanage. Beauvais sent an e-mail, demanding the rest of the adoption fees, which plaintiffs promised to pay once the case had been completed in the Guatemalan court. In response, Boraggina threatened to have the

Guatemalan attorney working on the case stop the adoption until such time as defendants were paid. (¶¶ 45-62).

Plaintiffs allege that they were the victims of extortion, arising from "the extreme fear that the adoption would be stopped and that they would not be allowed to bring the baby home." (¶ 63). (The Flennikens do not allege, however, that they paid any money in response to Boraggina's threat to stop the adoption.) In addition, they allege mail and wire fraud arising from their reliance on allegedly false statements and representations that defendants could complete the adoption and that the baby was in foster care. (¶¶ 66-67).

### 3. Plaintiffs Anthony and Jill Casassa

In January 2006, the Casassas signed an adoption referral form and contract regarding Guatemalan twins. They wired $22,700.00 to Waiting Angels to cover adoption fees and foster fee costs. (¶ 68). On May 24, 2006, defendant Boraggina e-mailed the Casassas and advised that the twins (Joselyn and Jerson) had been reclaimed by their birth mother. On the next day, the Casassas contacted the Guatemalan Embassy, who allegedly advised them that there was no pending adoption case involving the Casassas. Thereafter, defendants failed to respond to inquiries concerning the fate of the funds allegedly collected from them for expenses in Guatemala. On July 20, 2006, the Casassas sent a letter to defendants demanding return of the $23,726.00 paid to Waiting Angels. (¶ 74). In July 2006, the Casassas determined that the twins had not been reclaimed by their birth mother but had been matched to another adoptive family through a different agency "and defendant Boraggina had knowledge of that fact by the end of January or beginning of February 2006." (¶ 75). The Casassas allege that they were fraudulently induced to enter into adoption proceedings by

misrepresentations concerning the availability of the twins for adoption and that defendants collected from them fees for an adoption that was never started and for foster care for twin babies who had already been matched to another family through a different agency. They allege that defendants intended that the Casassas believe that the twins were in fact available for adoption so that they would send defendants money. (¶¶ 76-78).

4.      **Plaintiffs Philly and Michael Tavolilla**

The Tavolillas were considering adopting a baby through the defendants in May 2006. Defendants sent medical information on baby Marvin, which the Tavolillas took to a pediatrician for review. On May 25, 2006, when plaintiffs seemed unsure whether to begin the process of adoption, Boraggina telephoned them to say that they needed to wire money to defendants immediately because the baby was "gonna go." (¶ 84). Plaintiffs wired $16,000.00 to begin the adoption process. Two hours later, the pediatrician informed the Tavolillas that the child was extremely underweight and would probably have congenital disabilities. Plaintiffs immediately sent e-mails to defendants advising that they did not wish to proceed with the adoption and asked for return of their money, pursuant to an alleged previous promise by Boraggina that if a child were not healthy, the money would be returned. (¶ 86). Boraggina responded and referred the Tavolillas to defendant Beauvais, who handled all contractual and financial questions but was unavailable. In the meantime, the Tavolillas decided to pursue another child advertised on the website, named Jorge. They accepted the referral of Jorge on June 19, 2006, at 1:15 p.m. Defendant Beauvais wrote plaintiffs an e-mail three hours later, advising them that Jorge had just been placed with another agency fifteen minutes before plaintiffs' call. (¶¶ 89, 90).

Approximately one month later, on July 18, 2006, defendant Boraggina called plaintiffs to say that she was going to send photos of a nine-month-old baby boy. Plaintiffs asked whether they could apply the previous payment to this child, and Boraggina allegedly said that if plaintiffs did not accept the child and pay more money, she would post the child on-line. (¶ 92). Despite requests for return of the $16,000.00 they paid, the Tavolillas did not receive any refund from defendants. (¶ 93).

Plaintiffs allege that defendants wrongfully "created a sense of urgency" with regard to baby Marvin, to induce plaintiffs to wire money. (¶ 94). They claim that this act was extortionate, because it induced fear that the child would be "gone" unless the Tavolillas wired money. (¶ 100). They further claim that defendants tried to extort additional funds by offering another child, but they do not allege that they actually sent money or any other thing of value in response to this alleged act of extortion. (¶ 101). Further, they claim fraud on the basis of alleged misrepresentations concerning the availability of baby Marvin for adoption and Waiting Angels' policy concerning refund of fees if a child turned out to be unhealthy. (¶¶ 95-99).

### 5. Plaintiffs Jon and Regina Lundy

The Lundys began the process of adopting a baby boy (Victor) through Waiting Angels Adoption Services in May 2005. In this connection, they paid a $13,500.00 fee and signed an adoption agreement. They based their decision to use Waiting Angels "partly" on the representation that the agency was a nonprofit corporation. (¶ 102). The Lundys visited Victor in Guatemala in November 2005, pending approval of the adoption by the family court in that country. In January 2006, they decided to also adopt a girl. After they were told by defendants that the girl

was still available for adoption, they wired $12,350.00 for the adoption of baby Nancy, but defendants failed to send them an agreement covering this adoption. (¶ 104).

In May 2006, the Lundys went to Guatemala to finalize the adoption of Victor. During this period, they assert that defendants were uncommunicative and did not support them during the final stage of adoption. While the Lundys were in Guatemala, defendant Boraggina arranged for them to see baby Nancy. Plaintiffs arrived at the appointed time and place, but the child and her escort never appeared. The Lundys tried several times to contact Waiting Angels by telephone without success. After about five or six hours, they received an e-mail from defendant Boraggina, advising them that the Guatemalan attorney said that the birth mother was considering keeping the child and that defendant Beauvais would be following up on the issue the next day. On May 24, 2006, defendants informed the Lundys that the birth mother had decided to keep Nancy. The Lundys asked several times whether their foster fees of $1,050.00 paid for Nancy's care would be refunded, but defendants never responded. (¶¶ 105-109).

On or about July 13, 2006, the Lundys e-mailed defendants to inquire whether another baby girl featured on the website would be available for adoption, but Boraggina said the child was unavailable to them because she was with a different attorney. Subsequent efforts were unsuccessful, and the Lundys demanded a full refund. Defendants apparently refused to refund, saying they had every intention of completing the adoption. (¶¶ 110-115).

On the basis of these facts, the Lundys allege fraud arising from the representation that baby Nancy would be available. They allege that they wired money for an adoption and paid foster fees on the basis of this representation. They do not allege, however, that any defendant made this representation with knowledge of its falsity or with reckless disregard of its truth or falsity. They

-11-

further allege reliance on representations that defendants would find another referral and on the representation that money would be returned. (¶¶ 116-120).

6.      **Plaintiffs Robin and Curtis Wright**

The Wrights began the process of adopting a baby girl, Misha, in September 2005. The child's mother reclaimed her, however, so the Wrights were matched with a baby named Wendy, for whom they sent a $14,350.00 retainer fee and adoption payment. The Wrights, like other plaintiffs, allege that they relied in part on the representation that Waiting Angels was a nonprofit organization. (¶ 120).

The Wrights allege that they received only infrequent and delayed medical reports about Wendy, despite their repeated requests. While the adoption of Wendy was still pending, in January 2006, the Wrights decided to adopt a second child, Estafany, for whom the Wrights wired $14,350.00 in fees. In addition, with regard to Estafany, the Wrights were required to pay $350.00 per month to offset private foster care fees for the child. On June 5, 2006, the Wrights inquired about the slow pace of the adoption, and defendant Beauvais responded in writing saying that adoptions take five to eight months to complete. On November 7, 2006, the Wrights were notified that there was a problem with the power of attorney document that they had submitted for baby Wendy and that they were required to correct it. They allege they corrected it immediately so that it could be resubmitted, but that defendants failed to present the corrected document to the court until December 26, 2006. (¶¶ 122-127).

Plaintiffs allege that they found out through their own investigator that neither the Guatemalan adoption agency nor the foster mother received the $350.00 per month that they were

being charged by defendants. The investigator also informed them in December 2006 that the birth mother of Estafany had died, making Estafany ineligible for adoption under Guatemalan law. Plaintiffs allege that defendants failed to inform them of this until one month later in January 2007. The Wrights did complete the adoption process for Wendy, but it was only after an elapse of sixteen months and after they hired others to complete the adoption. (¶¶ 128-131).

The Wrights claim fraud arising from their collection of fees never remitted to the foster parents or agency, misrepresentations concerning the length of time that the adoption would take, and the misrepresentation of Waiting Angels as a nonprofit organization. (¶¶ 132-135).

### 7. Plaintiffs Odalys and Harold Saenz

Odalys and Harold Saenz began the process of adopting baby Maria on January 17, 2006. In this connection, they paid defendants a $4,000.00 retainer fee and signed an adoption agreement. They allege they based their decision to use Waiting Angels "partly" on the representation that it was a nonprofit organization. (¶ 136).

In January 2006, defendants charged plaintiffs fees for work done in Guatemala by a facilitator named Anthanese Thomas Collias. They allege that defendants knew or should have known that Collias had been banned by the U.S. Embassy from performing adoptions in Guatemala. Thereafter, plaintiffs sent a number of other payments to defendants to cover costs allegedly incurred in Guatemala. They were told that Maria would be home by her birthday, July 22, 2006, and then were told that the child would be there by Halloween, but neither promise was kept. (¶¶ 137-140).

Problems arose when defendants realized that Odalys and Harold Saenz were not born in the United States and that it would be difficult to procure their Cuban and Nicaraguan birth

certificates. Defendant Beauvais therefore told Odalys Saenz that she would have to get a birth certificate herself and to do it quickly. Saenz therefore had to pay "someone" $1,400.00 to procure her birth certificate from Cuba. Plaintiffs allege that even though their paperwork was ready in June 2006, defendants did not send the papers to the facilitator until November of that year. Plaintiffs inquired at the Guatemalan Consulate in Miami in February 2007 to determine the reasons for delays in the adoption. On or about April 11, 2007, the Consulate advised plaintiffs that the Guatemalan court had no record of baby Maria or of the adoption. (¶¶ 142-145).

On or about May 14, 2007, plaintiffs met with the Guatemalan facilitator, Collias, and found out that Waiting Angels had not paid him any money for the adoption. Collias demanded $10,400.00 plus the unpaid foster fees and other costs. (¶ 146). Plaintiffs allege that defendants delayed the adoption of baby Maria by not forwarding any of the fees and paperwork that plaintiffs had delivered to defendants. They allege that "defendants intentionally or negligently did not send the paperwork to Guatemala." (¶ 147). The Saenz plaintiffs completed their own adoption by handling matters themselves. Defendants nevertheless attempted to collect fees from them by threatening legal action in September 2007. (¶ 148).

Plaintiffs allege fraud arising from their reliance on the representation that defendants could facilitate an adoption through its completion and from the representation that defendants had resubmitted paperwork to Guatemalan officials. (¶¶ 151-154).

## Discussion

I. **RICO Claims Under 18 U.S.C. § 1962(c)**

Plaintiffs assert a RICO claim under 18 U.S.C. § 1962(c), which provides as follows:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). To state a claim under this statute, plaintiffs must plead the following elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985). To establish a pattern of racketeering activity, plaintiffs must allege at least two predicate acts of racketeering occurring within a ten-year period. 18 U.S.C. § 1961(5). The alleged predicate acts may consist of offenses which are indictable under any of a number of federal statutes. Here, plaintiffs allege as predicate acts extortion in violation of the Hobbs Act, 18 U.S.C. § 1951; mail and wire fraud, 18 U.S.C. §§ 1341, 1343; transmitting or transferring in interstate commerce goods, wares, merchandise or money knowing the same to have been stolen or taken by fraud, 18 U.S.C. § 2314; and travel in interstate or foreign commerce with the intent to distribute the proceeds of extortion, 18 U.S.C. § 1952.

Defendants' motion to dismiss challenges the legal sufficiency of plaintiffs' allegations in support of each category of predicate act, and, furthermore, challenges the existence of a pattern of racketeering activity under settled Supreme Court authority. Upon careful review of the third amended complaint, the court concludes that plaintiffs have alleged only four predicate acts and that these acts, accepted as true for present purposes, do not establish a pattern of racketeering activity.

A.      Extortion in Violation of The Hobbs Act

The Hobbs Act proscribes robbery or extortion that in any way affects commerce or the movement of any article or commodity in commerce. It provides as follows:

(a)     Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a). The statute specifically defines extortion as the "obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). Plaintiffs contend that certain of the acts alleged in the third amended complaint constitute indictable extortion in violation of the Hobbs Act. The third amended complaint alleges in conclusory fashion that six of the seven plaintiff couples were victims of extortion. (¶ 191(b)(i)). Plaintiffs' brief in response to the motion to dismiss, however, limits discussion of the alleged extortion charges to conduct involving two plaintiff groups: the Flennikens and the Tavolillas. Upon careful review of the allegations in the third amended complaint, accepting all well-pleaded factual assertions as true, the court concludes that plaintiffs have not alleged predicate acts of extortion with regard to any plaintiff group.[3]

In the case of the Flennikens, the alleged extortion arises from a demand that the Flennikens pay the balance of adoption fees owing under the contract. The Flennikens allege that

_____

[3] Defendants erroneously suggest that extortion in violation of the Hobbs Act is limited to conduct that involves the movement of an article or commodity in commerce, pointing out that adopted children are obviously not commodities. The statute, however, is not so limited. It covers conduct that "in any way or degree obstructs, delays, or affects commerce *or* the movement of any article or commodity in commerce." 18 U.S.C. § 1951(a) (emphasis added). The language is obviously in the disjunctive and is not limited only to tangible commodities. The jurisdictional interstate commerce threshold is *de minimis* and is satisfied by even a slight effect on any aspect of interstate commerce. *See United States v. Baylor*, 517 F.3d 899 (6th Cir.), *cert. denied*, 128 S. Ct. 2982 (2008). Thus, for example, the jurisdictional standard is met by robbery of a check-cashing business, even though no goods or commodities were involved. *United States v. Watkins*, 509 F.3d 277, 281 (6th Cir. 2007). Allegations of extortion in connection with an international adoption business meet the *de minimis* threshold.

they traveled to Guatemala in mid-March 2006 to visit the orphanage where baby Maria, the putative adoptee, was living. (¶ 57). They decided to provide foster care for the child themselves, and the Guatemalan attorney had them sign an agreement to that effect. (¶¶ 58, 59). They allege that defendant Boraggina called them and berated them for "being dishonest" and demanded that they take the baby back to the orphanage. (¶ 60). Defendant Beauvais then sent the Flennikens an e-mail "demanding the rest of the adoption fees. Plaintiffs Flenniken responded that according to the adoption contract the fees were not due until the case was out of PGN [the Guatemalan court] and that their attorney advised them to pay defendants at that time." (¶ 61). Despite the Flennikens' assurances that they would pay the final adoption fee, they allege that the defendants "requested that the Guatemalan attorney stop the adoption until they received a certified check." (¶ 62). Labeling this conduct "emotional terrorism," plaintiffs assert that Boraggina and Beauvais are guilty of criminal extortion arising from their request that the Guatemalan attorney stop the adoption until the remainder of the adoption fees were paid. (¶ 63). Plaintiffs do not allege, however, that they paid any money in response to this threat.

It is doubtful that the threat not to perform any further until the entire fee was paid amounts to extortion. *See Printers II, Inc. v. Professionals Pub., Inc.*, 784 F.2d 141, 148 (2d Cir. 1986) (threat to cease performance under contract is not extortion); *accord Robert Suris Gen. Contractor Corp. v. New Metro. Fed. Sav. & Loan Ass'n*, 873 F.2d 1401, 1405 (11th Cir. 1998). Leaving that issue aside, however, it is clear that plaintiffs have not alleged actionable extortion, because they do not allege that defendants "obtained property" as a result of the alleged "threat." A finding of criminal extortion with regard to the Flennikens is precluded by the Supreme Court's decision in *Scheidler v. National Organization for Women, Inc.*, 537 U.S. 393 (2003). The *Scheidler*

Court pointed out that by statutory definition, extortion means "the obtaining of property from another" induced by wrongful use of actual or threatened force, violence, or fear. 18 U.S.C. § 1951(b)(2). This statutory language requires both that the victim be deprived of property and that the perpetrator "obtain" property from another. 537 U.S. at 405. Indulging the dubious proposition that the "threat" alleged in paragraph 63 of the third amended complaint would satisfy the Hobbs Act, plaintiffs' allegations remain deficient for lack of any claim that defendants obtained anything from the Flennikens, or that the Flennikens were deprived of anything, as a result of this threat. The Flennikens fail to allege that they paid any money in response to the "threat."[4]

The criminal extortion with regard to the Tavolillas also allegedly occurred in May 2006. The Tavolillas allege that they had been considering adopting a baby and that Waiting Angels had sent medical information on baby Marvin, which the Tavolillas and their pediatrician were reviewing. (¶ 83). On May 25, 2006, when the Tavolillas seemed unsure of whether to begin the adoption process, defendant Boraggina telephoned plaintiffs and said they would need to wire the money to defendants immediately for baby Marvin because "he's gonna go, he's gonna go, he's gonna go!" In response, plaintiffs wired $16,000.00 to defendants to begin the adoption process. (¶ 84). Two hours later, the Tavolillas received a call from their pediatrician, who advised them that baby Marvin had serious health problems, and the Marvins decided not to proceed with the adoption. (¶¶ 85-86).

---

[4] The Tavolillas may be attempting to allege a similar instance of extortion in paragraph 92 of the third amended complaint. There, they assert that Boraggina called them to say that she was sending photos of a nine-month-old boy, and that if they "didn't accept this child and pay more money she would have to post the child online." This "threat" bears no resemblance to actionable extortion, but even if it did, the claim fails for lack of any allegation that the Tavolillas parted with any property in response to the threat.

-18-

The essence of plaintiffs' criminal extortion claim is that Boraggina "extorted" the $16,000 fee from the Tavolillas by creating a sense of urgency in saying that the child they were considering for adoption was "gonna go" unless the Tavolillas acted. Plaintiffs have not cited a single case in which even a remotely similar representation has been held to constitute criminal extortion. To be sure, the concept of extortion is broad. Private citizens can commit extortion by leading a victim to believe that the defendant can exercise his or her power to the victim's economic detriment. *See United States v. Kelley*, 461 F.3d 817, 826 (6th Cir. 2008). The fear need not even be the product of the defendant's actions, if the fear exists and the defendant intentionally exploits it. *See United States v. Collins*, 78 F.3d 1021, 1030 (6th Cir. 1996). To constitute extortion, however, an actor's threats or inducing of fear must be "wrongful." 18 U.S.C. § 1951(b)(2); *see, e.g., United States v. Abbey*, 560 F.3d 513, 516 (6th Cir. 2009). Consequently, a RICO plaintiff relying on the predicate act of extortion must allege both "wrongful means and wrongful objective." *See Mathon v. Feldstein*, 303 F. Supp. 2d 317, 324 (E.D.N.Y. 2004). In the concrete circumstances of this case, plaintiffs must therefore allege facts and circumstances showing that the urgency created by the statement "he's gonna go," was somehow wrongful and not an accurate reflection of reality.

Plaintiffs make much of the emotional nature of adoption proceedings, but their own allegations show that the Tavolillas had no relationship whatsoever with baby Marvin at the time of the alleged extortionate statement. Rather, they were merely "considering" adopting the child (¶ 83) and had received information that they and their pediatrician were reviewing. (*Id.*). They unilaterally decided not to proceed with the adoption later the same day. Adoption agencies are selling a service, not babies. The relationship between them and their customers is essentially

contractual. To state a federal claim, a plaintiff must allege sufficient facts to show that violation of his or her rights was "plausible" in the circumstances. *Iqbal*, 129 S. Ct. at 1949. "Hard bargaining" in a business context is not extortionate. *Id.* at 325; *see Center Cadillac, Inc. v. Bank Leumi Trust Co.*, 859 F. Supp. 97, 105 (S.D.N.Y. 1994), *aff'd*, 99 F.3d 401 (2d Cir. 1995). A threat of economic harm is not "per se" wrongful. *United States v. Kattar*, 840 F.2d 118, 123 (1st Cir. 1988). Rather, the complaint must allege enough facts to show that the statement was wrongful in the circumstances. The facts set forth in the third amended complaint, accepted as true, fail to establish a plausible basis for concluding that the "sense of urgency" created by defendant Boraggina was in any sense wrongful.

In summary, the third amended complaint alleges no facts that might give rise to a plausible claim of extortion in violation of the Hobbs Act.

### B.     Mail Fraud and Wire Fraud

Plaintiffs' principal efforts to allege predicate acts under RICO involve claims of mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343). The elements of each crime are the same. Defendants must have (1) formulated a scheme to defraud and (2) used or caused the use of the mails (or the wires) in furtherance of the scheme. *See United States v. Jamieson*, 427 F.3d 394, 402 (6th Cir. 2005) (mail fraud); *United States v. Gale*, 468 F.3d 929, 936-37 (6th Cir. 2006) (wire fraud); *see also United States v. Daniel*, 329 F.3d 480, 486 n.1 (6th Cir. 2003) (elements of mail and wire fraud are essentially the same). A scheme to defraud includes "any plan or course of action by which someone uses false, deceptive, or fraudulent pretenses, representations, or promises to deprive someone else of money." *Jamieson*, 427 F.3d at 402. A conviction under either statute requires

proof of a specific intent to defraud. *United States v. Vasilakos*, 508 F.3d 401, 409 (6th Cir. 2007).

That is, the defendant must knowingly misrepresent or omit a material fact, with the purpose of

inducing the victim to undertake an action that the victim would not otherwise have undertaken

without the misrepresentation. *United States v. DeSantis*, 134 F.3d 760, 764 (6th Cir. 1998). In the

alternative, the *scienter* requirement is satisfied if the defendant acted recklessly. Recklessness is

an extreme departure from the standards of ordinary care arising from the making of a false statement

that the defendant either knows to be false or is so obviously false that the actor must have been

aware of its falsity. *Id.*

      In pleading predicate acts of mail or wire fraud, plaintiffs must comply with the

heightened pleading standard established by Rule 9(b) of the Federal Civil Rules of Procedure, which

requires that a party "state with particularity the circumstances constituting fraud." In complying

with Rule 9(b), a plaintiff must, at minimum, (1) specify the fraudulent statements, (2) identify the

speaker, (3) state where and when the statements were made, and (4) explain why the statements

were fraudulent. *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2009).[5]

---

[5] Defendants have presented the court with a detailed analysis of the pleading deficiencies of the third amended complaint, the allegations of which often lack specificity with regard to such central issues as identity of the fraudulent speaker and date and circumstance of the alleged misrepresentation. (*See* Def. Brief, docket # 75, attachments B-H). For the most part, plaintiffs have not attempted to answer this detailed critique. Plaintiffs merely argue that further discovery will fill in the myriad missing blanks. In certain circumstances, a RICO plaintiff should be given an opportunity to amend the complaint after discovery to provide the missing details required by Rule 9(b). *See Brown v. Cassens Transp. Co.*, 546 F.3d 347, 356 n.4 (6th Cir. 2008), *petition for cert. filed*, 77 U.S.L.W. 3635 (U.S. May 6, 2009) (No. 08-1375). This rule principally applies to details that plaintiffs would not naturally know firsthand. It has no application, however, to details that the plaintiffs should already know, such as the date of communications to which they were a party. Nevertheless, the court elects not to rely at this juncture on the lack of detail in the third amended complaint. Rather, the court focuses only on plaintiffs' failure to plead the substantive elements of claims of mail or wire fraud as required by Rules 8 and 9(b).

1.  "Promissory Fraud," Including Representations Concerning Timeliness and Ability to Complete Adoption

Every plaintiff group alleges that defendants represented that they could complete the adoption, but that the adoption was never completed. Additionally, they each allege that defendants represented that the adoption would take a certain amount of time, but that in fact the process dragged on well beyond the time represented. Some plaintiffs, such as the Tavolillas, allege that defendants represented that a baby would be available for adoption or would be healthy, when this turned out not to be true. "Plaintiffs Tavolilla did in fact rely on the Defendants [sic] representations that the baby Marvin would be available for adoption and healthy and they did wire the money to the Defendants." (¶ 96). Other plaintiffs allege that defendants did not keep their promises concerning the various steps necessary in Guatemala to advance the adoption. With one exception, none of these allegations is sufficient to establish mail or wire fraud, because plaintiffs fail to allege that the representations were false when made and that the person making the representation acted with knowledge or reckless disregard of falsity.

Rule 9(b) requires not only a specification of the allegedly false statements made, but also requires an identification of the basis for inferring *scienter*. *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1327 n.4 (Fed. Cir. 2009) (collecting cases); *North Am. Catholic Educ. Programming Found., Inc. v. Cardinale*, 567 F.3d 8, 13 (1st Cir. 2009). As Judge (now Justice) Breyer stated the rule, "The courts have uniformly held inadequate a complaint's general averment of the defendant's 'knowledge' of material falsity, unless the complaint *also* sets forth specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading." *Greenstone v. Cambex Corp.*, 975 F.2d 22, 25 (1st Cir. 1992). When RICO predicate

acts of mail and wire fraud involve broken promises, a plaintiff must therefore allege that the

defendant had "no intention of carrying out" the promise when it was made. *See Vild v. Visconsi*,

956 F.2d 560, 567 (6th Cir. 1992). This requirement is inherent in the nature of fraud. A mere

breach of contract cannot form the basis for a mail fraud prosecution. *United States v. Lee*, No. 94-

2204, 1995 WL 506990, at * 4 (6th Cir. Aug. 24, 1995) (citing *United States v. D'Amato*, 39 F.3d

1249, 1261 n.8 (2d Cir. 1994) ("A breach of contract does not amount to mail fraud.")). "The mail

and wire fraud statutes apply only when a promisor enters into an agreement *knowing* that he does

not intend to perform under the agreement." *Lee*, 1995 WL 506990, at * 4 (citing *United States v.

Paccione*, 949 F.2d 1183, 1196 (2d Cir. 1991)).[6] In the present case, plaintiffs do not allege that

defendants made their time predictions with knowledge or reckless disregard of their falsity. Nor

do they allege that when the predictions were made defendants had no intention of performing within

the time line stated. Likewise, with one exception, plaintiffs do not allege that any defendant

represented a child to be available when the defendant knew that the child was in fact not available

or acted with reckless disregard of the statement's truth or falsity.

The allegations in the third amended complaint are insufficient to elevate most of

plaintiffs' claims of nonperformance to criminal fraud. For example, the Heinriches allege that in

May 2005, Boraggina told them the adoption would be complete in four to six months after their

dossier was certified. (¶¶ 24, 25). They also allege that Boraggina represented to them that baby

Selvin was available for adoption. (¶ 26). They finally abandoned the effort to adopt the child in

---

[6] The same result obtains under the common law. Failure to keep a promise may amount to breach of contract, but it is only fraudulent when the actor had no present intention to keep the promise at the time he made it. *See Hi-Way Motor Co. v. International Harvester* Co., 247 N.W.2d 813, 816-17 (Mich. 1976). Hence, the third amended complaint fails to state a claim even for common-law fraud, let alone the crime of federal mail or wire fraud.

December 2006 because of difficulties in Guatemala. (¶ 39). They allege in conclusory fashion that these and other representations were false, but fail to allege "specific facts" that make it reasonable to conclude that Boraggina made these predictions or promises with knowledge of their falsity and no present intent to fulfill them.[7]

Negligence, even "serious" negligence, and breach of contract do not form the basis of a mail fraud prosecution. *Lee*, 1995 WL 506990, at * 4. In the absence of a proper allegation of falsity and *scienter*, most of plaintiffs' allegations of nonperformance do not amount to mail or wire fraud. Even domestic adoptions are frequently delayed or are rendered unsuccessful by events outside anyone's control. In the context of international adoptions, such delays and frustrations are commonplace. Mothers change their minds, foreign courts may act unpredictably, language barriers cause misunderstandings, and myriad other circumstances may legitimately delay or frustrate an attempted adoption. In this factual context, therefore, a plaintiff alleging fraud is required by *Twombly* to present sufficient information to render fraud plausible, as opposed to merely speculatively possible. *See CSX Transp., Inc. v. Meserole Street Recycling, Inc.*, 570 F. Supp. 2d 966, 969 (W.D. Mich. 2008). Merely alleging that the adoption took longer than represented or that the adoption agency represented a baby to be available who ultimately turned out not to be available, without more, barely alleges a breach of contract, let alone an intentional fraud.

The only plaintiffs alleging an actionable fraud in this regard are the Casassas. They allege that "Defendants" matched them with twin babies on January 28, 2006. (¶ 68). In response, they wired money for adoption fees and foster care fees. (*Id.*). About four months later, on May 24,

---

[7] Indeed, in another part of the complaint, plaintiffs allege that Waiting Angels posted pictures of children but "did not verify that these children were available for adoption before matching the child with the adoptive parents." (¶ 156). This is negligence, not fraud.

2006, defendant Boraggina e-mailed them to advise that the birth mother had reclaimed the twins. (¶ 69). The twins had not been reclaimed by their birth mother. They had already been matched with another adoptive family through a different adoption agency. The Casassas allege that Boraggina knew this at the end of January, when Waiting Angels collected fees for the adoption. (*Id.*). In support of this allegation, they aver that (1) during the four months that they were supposedly "matched" with the twins, Waiting Angels sent them no photos or medical information (¶ 70); (2) the U.S. Embassy in Guatemala had no record of an adoption case involving the Casassas (¶ 71); (3) defendants refused to provide proof that plaintiffs' money had ever been sent to Guatemala (¶ 73); and (4) the twins had not been reclaimed by their birth mother, but in fact had already been matched with another family by a different adoption agency (¶ 75). These facts, and the allowable inferences therefrom, are sufficient to allege a scheme to defraud the Casassas by intentionally misleading them concerning the availability of the twins, collecting money on the basis of the knowingly false representation, and using, or causing to be used, the instrumentalities of commerce in furtherance of the scheme.

In summary, the only predicate act of mail or wire fraud involving broken promises involves the Casassa plaintiffs and arises on or around January 28, 2006, when the Casassas were induced to pay $22,700.00 by allegedly fraudulent representations. Because plaintiffs have failed, despite repeated opportunities for cure, to allege that defendants had the requisite knowledge and *scienter*, their other allegations concerning broken promises in connection with their frustrated adoptions fail to state a claim upon which relief can be granted for mail or wire fraud.

2. Misrepresentation of Nonprofit Status

Several plaintiffs allege that they were induced to do business with Waiting Angels Adoption Services "partly" in reliance on the representation of the agency's nonprofit status, as posted on the website. (*See, e.g.,* Lundy (¶ 102), Saenz (¶ 136). Plaintiffs further allege that this representation was false.

The allegation that some plaintiffs were led to do business with Waiting Angels on the basis of its nonprofit status does not qualify as a predicate act of wire fraud, because plaintiffs have failed to allege proximate causation between the alleged misrepresentation and their injuries. A RICO plaintiff need not plead or prove first-party reliance on an allegedly fraudulent statement. *See Bridge v. Phoenix Bond & Indemnity Co.*, ___ U.S. ___, 128 S. Ct. 2131 (2008). To allege a valid RICO claim, however, a plaintiff must show "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Securities Investor Prot. Corp.*, 503 U.S. 258, 268 (1992). A plaintiff may not succeed by merely showing that the predicate act was a "cause in fact" of plaintiff's injuries. *Id.* at 268. "Rather, section 1964(c) requires that the defendant's specified acts of racketeering were the proximate cause of the plaintiff's injuries." *George Lussier, Inc. v. Subaru of New England*, 393 F.3d 36, 51 (1st Cir. 2004). The Supreme Court has recently reaffirmed the requirement of proximate causation, over Justice Thomas's dissent, accusing the Court of imposing a "stringent proximate causation requirement." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 463 (2006).

Plaintiffs fail to allege in any coherent manner that any injury to their "business or property" was proximately caused by Waiting Angels' misrepresentation of its status as a nonprofit organization. Plaintiffs argue that the agency's status as a nonprofit corporation gave them

confidence in its integrity and therefore was, at least in part, an inducement to do business with Waiting Angels. This, at best, alleges but-for causation. Plaintiffs' damages did not arise from the form of corporate organization of Waiting Angels, but by alleged misrepresentations concerning the agency's abilities, collection of money under false pretenses, and other wrongful acts completely divorced from the corporate status of the agency. If each plaintiff contracting with Waiting Angels had been successful in adopting a child precisely as promised by the agency, no conceivable harm could have arisen from the misrepresentation of its nonprofit status. Plaintiffs' theory, therefore, is that they were induced to deal with Waiting Angels in part by its nonprofit status and that this decision put them in a position to be defrauded by other, unrelated representations. The statute requires that a plaintiff plead and prove that he was injured in his business or property "by reason of" a pattern of racketeering activity. 18 U.S.C. § 1964(c). Plaintiffs have failed to allege facts showing, even inferentially, that any harm to their business or property proximately resulted from any misrepresentation concerning the corporate form of Waiting Angels Adoption Agency.

3.      Fraudulent Inducement of Payment of Foster Care and Other Expenses

Several plaintiffs allege that defendants fraudulently collected fees from them, by the use of the instrumentalities of commerce, to reimburse Waiting Angels for expenses that were never incurred. Such allegations fall within the heartland of mail fraud and wire fraud, as proscribed by federal statute. Specifically, plaintiffs allege as follows:

•       In January 2006, the Flennikens received an invoice for foster care fees for baby Maria for $1,050.00. (¶ 49). When the Flennikens traveled to Guatemala in mid-March of 2006, to visit the baby, they were taken to an orphanage where Maria was living. They allege that

Maria had never lived in foster care but in fact had continuously been in the orphanage. (¶ 57).

•  In September 2005, the Wrights sent $14,350.00 to Waiting Angels, after which an adoption agreement was faxed to them. (¶ 121). The agreement required them to pay $350.00 per month to defendants to "offset private foster care fees for the child." (¶ 124). Plaintiffs learned through an investigator that the foster mother never received the $350.00 per month charged by defendants. (¶ 128).

•  In February 2006, the Saenz plaintiffs wired $8,500.00 to defendants for payment of "in-country" fees to be disbursed by the facilitators in Guatemala for adoption of baby Maria. (¶ 139). They were also charged $350.00 per month for foster fees. (¶ 140). In May 2007, plaintiffs learned that defendants had not paid any money to the facilitator for the adoption and that the foster fees remained unpaid. (¶ 146).

Although plaintiffs have not pleaded these claims as clearly as they should have, they are sufficient to allege predicate acts of mail or wire fraud. These plaintiffs allege a scheme to defraud, consisting of requests for payment to cover fees for foster care and other services rendered in Guatemala, when in fact no services were performed. They also adequately allege use of the instrumentalities of commerce in furtherance of the scheme. It is clear that the submission of false invoices or other requests for payment for services that were not rendered or in amounts in excess of that which is owed can form the basis for a federal mail or wire fraud prosecution. *See, e.g., Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985) (RICO case based on alleged over-billing); *United States v. Talbott*, 590 F.2d 192 (6th Cir. 1978) (criminal mail fraud prosecution for false

billing). Consequently, at the pleading stage, plaintiffs have alleged predicate acts of mail or wire fraud occurring in September 2005 and January and February 2006.

C.    Violations of 18 U.S.C. § 1952 and 2314

Plaintiffs also attempt to allege predicate acts based upon violation of the statute criminalizing travel in interstate or foreign commerce with the intent to distribute the proceeds of extortion, 18 U.S.C. § 1952(a)(1), and violation of 18 U.S.C. § 2314, for transmitting or transferring money in interstate commerce knowing the same to have been stolen or taken by fraud. These predicate acts may be dismissed summarily. As discussed in section A above, plaintiffs have not established any act of extortion, so their claim of travel to distribute the proceeds of extortion must therefore fail. With regard to section 2314, plaintiffs plainly plead no facts that would support a plausible claim under the statute.

In summary, plaintiffs have alleged four plausible claims of mail or wire fraud, which span the period September 2005 to February 2006. The next question is whether these predicate acts constitute a pattern of racketeering.

D.    Pattern of Racketeering

To establish a substantive RICO violation, a plaintiff must show a "pattern of racketeering activity." 18 U.S.C. § 1962(a)-(c). According to RICO's definitional section, a pattern of racketeering activity requires at least two acts of racketeering activity within ten years of each other. 18 U.S.C. § 1961(5). In *H.J., Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989), the Supreme Court held that while two predicate acts are necessary, "they may not be sufficient." 492 U.S. at 237. Beyond setting forth the minimum number of predicate acts required to establish

a pattern, section 1961(5) "assumes that there is something to a RICO pattern *beyond* simply the number of predicate acts involved."  492 U.S. at 238.  Within the numerous sorts of relationships that can constitute a pattern, two elements must be shown:  "That the racketeering predicates are *related*, and that they amount to or pose a threat of *continued* criminal activity.  *Id.* at 239 (emphasis added); *see Brown*, 546 F.3d at 354.  This is now known as the "relationship plus continuity" test.

The second prong of the "relationship plus continuity" test can be satisfied either by showing a "closed-ended" pattern (a series of related predicate acts extending over a substantial period of time) or by demonstrating an "open-ended" pattern of racketeering activity (one that poses a threat of continuing criminal conduct beyond the period during which the predicate acts were performed).  *H.J., Inc.*, 492 U.S. at 241.  The determination whether a pattern of racketeering activity has been alleged requires a court to probe the specific facts of each case.  *Brown*, 546 F.3d at 354.  The third amended complaint does not satisfy the requirements of either closed-ended or open-ended continuity.

As found above, the third amended complaint is sufficient to allege four predicate acts of mail or wire fraud.  The first requirement of the relationship plus continuity test is that the predicate acts have the same or similar purposes, results, participants, victim, or methods of commission "or otherwise are interrelated by distinguishing characteristics and are not isolated events."  *H.J., Inc.*, 492 U.S. at 240.  For present purposes, the court concludes that the four predicate acts alleged by plaintiffs satisfy the relationship test.  They have the same alleged purpose:  to obtain money from adoptive parents on the basis of false representations.  They have the same result:  to obtain money without delivering the services promised.  They have the same participants:  Boraggina

and Beauvais on the one hand and putative adoptive parents on the other. They have similar methods of commission, and the victims are similar.

Plaintiffs fail, however, to meet the requirements of continuity, on either an open-ended or closed-ended theory. "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *H.J., Inc.*, 492 U.S. at 242. Although factors such as the number and variety of predicate acts and the number of participants may be germane to this showing, "closed-ended continuity is primarily a temporal concept." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 184 (2d Cir. 2008). The relevant period, moreover, is the time during which RICO predicate activity occurred, "not the time during which the underlying scheme operated or the underlying dispute took place." *Id.* The Supreme Court has clearly stated that predicate acts "extending over a few weeks or months and threatening no future criminal conduct do not satisfy" the continuity requirement. *H.J., Inc.*, 492 U.S. at 242.

Even if this court had credited all predicate acts that plaintiffs have attempted to allege, the period of time involved spans only seventeen months (June 15, 2005 through November 2006). It is unlikely that predicate acts extending over this seventeen-month period would be sufficient to satisfy closed-ended continuity. *See Vemco, Inc. v. Camardella*, 23 F.3d 129, 133-34 (6th Cir. 1994) (alleged RICO conspiracy involving a single scheme to defraud a limited number of victims and lasting only seventeen months insufficient to meet continuity requirement). Although temporal duration is not the sole criterion, some courts of appeals have held that a period of less than two years will generally not constitute a "substantial period of time" for purposes of the RICO statute. *See, e.g., Spool*, 520 F.3d at 184. Those cases in which closed-ended continuity has been

found to exist involve more predicate acts, a greater expanse of time, and more widespread illegal conduct. *See, e.g., Brown*, 546 F.3d at 355 (fraudulent scheme designed to deprive employees of worker's compensation benefits, involving at least thirteen predicate acts extending over a three-year period, satisfies closed-ended continuity). The present case, however, involves only four predicate acts of mail or wire fraud, spanning the five-month period from September 2005 to February 2006. The parties have not cited a single case in which so few predicate acts, involving so few victims, and spanning such a short period of time have been held to satisfy the closed-ended continuity requirement.

Open-ended continuity is also lacking. To satisfy open-ended continuity, the plaintiff must allege that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed. The Supreme Court has explained that this kind of threat can arise in two general situations. First, a RICO pattern may be established by a few predicate acts, spanning a short period of time, when the enterprise's business is primarily or inherently unlawful. The Court used the example of a gangster protection racket which poses "a specific threat of repetition extending indefinitely into the future." *H.J., Inc.*, 492 U.S. at 242. The lower courts have recognized that where the "business" of the enterprise is inherently unlawful, such as those involving murder or obstruction of justice, or was in pursuit of inherently unlawful goals, such as narcotic trafficking, the requisite threat of continuity is adequately established. *See United States v. Aulicino*, 44 F.3d 1102, 1111 (2d Cir. 1995); *United States v. Indelicato*, 865 F.2d 1370, 1383-84 (2d Cir. 1989) (*en banc*). The other method of establishing open-ended continuity arises when "the predicates are a regular way of conducting defendant's ongoing legitimate business." *H.J., Inc.*, 492 U.S. at 243. In determining whether this test has been met, the court focuses not only on the

predicate acts, but also on the totality of the circumstances surrounding commission of those acts. *Brown*, 546 F.3d at 355. Again, even looking at the entirety of the third amended complaint, and taking into account all of the alleged wrongdoing asserted therein (even those things found not to be predicate acts), open-ended continuity is patently lacking. The alleged wrongdoing lasted less than eighteen months, the adoption agency is now out of business, the individual defendants have been convicted in the state courts of tax evasion and have been barred from the adoption business, and the threat that they once may have posed is a thing of the past.

A recent decision of the Second Circuit, in a factually similar case, is instructive. *Spool v. World Child International Adoption Agency* was an action by a domestic adoption agency and two of its clients alleging RICO claims against an international adoption agency with whom plaintiffs had collaborated. The predicate acts alleged by the corporate plaintiff (CFA) were essentially mail and wire fraud claims arising from excessive billing for services rendered in connection with international adoptions, among others. The individual plaintiffs asserted claims arising from a failed Russian adoption. Although they paid an advance fee of $12,000.00 to the defendant agency, when plaintiffs arrived in Russia they were required to pay fees again for the same services. The Russian court denied their adoption application, allegedly because of failures of the defendant. In short, the nature and circumstances of the claims brought by plaintiffs in the *Spool* case were similar to those brought by plaintiffs in the present case. The Second Circuit accepted at face value the validity of the various predicate acts alleged, but affirmed dismissal on the ground that plaintiffs had not alleged either closed-ended or open-ended continuity. The time period during which the predicate acts occurred (January 2004 through April 19, 2005) spanned sixteen moths. "This sixteen-month period of time is insufficient to establish closed-ended continuity -- particularly

in the absence of separate schemes or large numbers of participants and victims." 520 F.3d at 184.

Open-ended continuity was likewise lacking, as the enterprise "cannot be said to pose a threat of

continuing conduct." *Id.* at 186. By the time the complaint was filed, the principals of the defendant

corporation had been convicted. The *Spool* complaint alleged only a "serious, but discrete and

relatively short-lived scheme to defraud a handful of victims," which the court held insufficient to

establish open-ended continuity. *Id.*

   In summary, the pleading of four predicate offenses of mail or wire fraud, spanning

a period of less than six months, is insufficient to establish a pattern of racketeering activity for

purposes of a section 1962(c) violation. The court therefore finds that the third amended complaint

fails to state a claim upon which relief can be granted under section 1962(c).

### II.  RICO Claims Under 18 U.S.C. § 1962(d)

   Plaintiffs' claims of a RICO conspiracy require little discussion. To establish a

violation of 18 U.S.C. § 1962(d), plaintiffs must successfully allege all the elements of a RICO

violation, in addition to alleging "the existence of an illicit agreement to violate the substantive

RICO provision." *United States v. Sinito*, 723 F.2d 1250, 1260 (6th Cir. 1983); *United States v.*

*Hammoud*, 556 F. Supp. 2d 710, 713 (E.D. Mich. 2008). Where, as here, the substantive RICO

count fails to state a claim, the conspiracy claim "cannot stand." *Craighead v. E.F. Hutton & Co.,*

*Inc.*, 899 F.2d 485, 495 (6th Cir. 1990); *McIntyre's Mini-Computer Sales Group, Inc. v. Creative*

*Synergy Corp.*, 644 F. Supp. 580, 585 (E.D. Mich. 1986). "In addition, because Plaintiffs have failed

to state a substantive RICO claim, the Court will also dismiss Plaintiffs' RICO conspiracy claim,

alleged under section 1962(d)." *Broad, Vogt & Conant, Inc. v. Alsthom Automation, Inc.*, 200 F. Supp. 2d 756, 760 (E.D. Mich. 2002).

In summary, plaintiffs' fourth attempt to allege an actionable RICO claim arising from the sad facts of this case is patently deficient. If the facts alleged in the complaint are supported by proof, plaintiffs may well be entitled to a refund of fees paid in connection with the failed adoption attempts, under a theory of breach of contract, common-law misrepresentation, or negligence. Plaintiffs have not, however, alleged claims that come close to a RICO violation. The court will therefore enter an order dismissing counts 7, 8 and 9 with prejudice, for failure to state a claim upon which relief can be granted.

### III. Pendent State-Law Claims

Plaintiffs ask the court to exercise supplemental jurisdiction over their pendent state-law claims. "Supplemental jurisdiction is a doctrine of discretion, not of plaintiff's right." *Habich v. City of Dearborn*, 331 F.3d 524, 535 (6th Cir. 2003). Generally, where all federal claims have been dismissed, federal courts decline to exercise supplemental jurisdiction over a plaintiff's state-law claims. *See* 28 U.S.C. § 1367(c)(3); *see also Brooks v. Rothe*, 577 F.3d 701, 709 (6th Cir. 2009). There is no reason in this case to depart from the general rule. The relationship between plaintiffs and defendants was created and governed by state law. Diversity of citizenship does not exist, and, with dismissal of the RICO claims, neither does any federal interest. The state courts are the appropriate forum for adjudication of plaintiffs' contract and tort claims.

## **Conclusion**

The facts alleged in the third amended complaint, accepted as true, fail to establish a substantive RICO violation or a RICO conspiracy. Defendants' motion to dismiss for failure to state a claim upon which relief can be granted, brought under Fed. R. Civ. P. 12(b)(6), will be granted, and plaintiffs' federal claims will be dismissed with prejudice. A final judgment will be entered dismissing with prejudice counts 7, 8 and 9 of the third amended complaint. All state-law claims in the third amended complaint will be dismissed without prejudice.


Dated: October 19, 2009          /s/  Joseph G. Scoville
                                 United States Magistrate Judge